## O'Brien's Adm'x v. Murray.

(Decided Feb. 18, 1938.)

ROGERS & ROGERS and J. L. CUSHING for appellant.

WARE & WARE and WILLIAM O. WARE for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

This is the second appeal of this case. The history and facts of the case are briefly set out in the opinion of the first appeal, 258 Ky. 140, 79 S. W. (2d) 414, 415, and a reference to that opinion is sufficient without repeating them in this opinion.

The case was reversed on the former appeal because the court refused to permit a witness for the appellant to testify to certain alleged statements made to him by appellee concerning the alleged gift by the deceased O'Brien, to appellee of the bonds in question. Counsel for appellant made an avowal set out in the former opinion as follows:

"That on the occasion referred to the plaintiff called at his office and in the course of the conversation she stated that in 1924 (correct date 1923) in July of that year, the decedent, Thomas J. O'Brien, gave to her the four one-thousand dollar City of Cincinnati municipal bonds referred to in the pleading, with the understanding that in the event she outlived him the bonds were to be hers, but in the event he outlived her, they were to remain his property; that during the time from February, 1924 (instead of July, 1923) up until the latter part of July, 1927, he clipped from the bonds all of the coupons and collected all of the income on them, and that in July, 1927, she was preparing to take a trip to New York and Canada and that she went to

the safety deposit box and procured these bonds and delivered them to Mr. O'Brien, with the statement that she wanted him to have them while she was away on this trip, so that if anything should happen to her that these bonds would not be found among her possessions, that she wanted to carry out her agreement with him when they were left with her in the first instance."

It is further said in that opinion:

"If that answer was true, it was an admission by plaintiff as to the terms and conditions upon which the bonds were originally delivered to her, and which is the only transaction through which she claims to have become the owner of them through the inter vivos gift which she avers that transaction completed. But if the transaction took the form as set forth in the avowal, it was no more than an incomplete or abortive gift, and resulted in only a bailment of the bonds by O'Brien to plaintiff and which never invested the title to them in her. So that, when she returned them to him in July, 1927, it was only a termination of that ineffective gift creating only a bailment of the bonds to her by decedent."

On a return of the case to the circuit court it was retried upon the same pleadings and substantially the same evidence, in addition to the evidence of John L. Cushing for appellant. Appellee relied upon the evidence of her sister, Elizabeth Murray, to establish the alleged gift of the bonds, and her evidence was substantially the same as that indicated in the former opinion. Other witnesses testified for appellee concerning her association with O'Brien, and particularly her various visits and acts of kindness to him while he was confined in the sanitarium some time previous to his death, but no witness, except appellee's sister, claimed to know anything about the alleged gift. At the close of appellee's evidence Mr. John L. Cushing, attorney for appellant, administratrix, was permitted to testify to the alleged statements made to him by appellee.

It appears that appellee was endeavoring to procure the bonds from appellant without a suit and called at the office of the witness, Mr. Cushing, to discuss with him the alleged gift and her alleged ownership of the

bonds. He detailed that conversation in the following language:

"A. Well, when she told me the purpose of her visit I asked her a number of questions concerning the type of. bonds, the ownership, where she got them. In other words, she had been referred to me by the administratrix of an estate that I represented and she was putting in a claim against the estate and before I refused or approved the claim, I wanted to know as much about it as I could, possibly find out, and I did question Miss Murray to a great extent as to where she got the bonds. She told me Thomas J. O'Brien made her a present of them. I asked her when; she told me in 1923. She had with her at that time a program of music of Mary Garden at Music Hall, and she said it was on that day, I think it was February 21st, 1923, and that he came down to her house and said to her, 'Here are some bonds I want you to have.' She said she didn't want to take the bonds. She told Tom, 'No, you need them, you keep them. I don't want your money,' and that after considerable conversation between herself and Mr. O'Brien, she agreed that she would keep the bonds for Mr. O'Brien, that if he died, she would then continue to hold them as her own, but if she died first, that Mr. O'Brien would be entitled to have the bonds back. I asked her also who clipped the coupons and used the money and she said Mr. O'Brien did. I asked her if it didn't seem strange that she should claim the ownership of the bonds and let Mr. O'Brien have the proceeds and she said, 'Mr. Cushing, I wouldn't take any man's money,' and I asked her the type of bonds, City of Cincinnati; I asked her how many, four thousand dollar, four and one-half percent, and I told her after some questioning the gist of which I have given, I may have asked her a few other questions, I told her that I would have to think the matter over first and find out about it, as far as I knew there were no four one thousand dollar City of Cincinnati bonds among Mr. O'Brien's securities; after talking to Mrs. Cushing, going over the accounts, her accounts and her reports as committee, after looking in the safety deposit box that she had rented in the First National

Bank in Covington as Administratrix, we found no evidence that there had ever been four one thousand dollar City of Cincinnati bonds and I wrote Miss Murray a letter telling her we couldn't approve her claim against the estate. * * *

. "Q. Was that the only visit she made to your office? A. That was the only visit but I omitted one other question or one other phase of the question. I asked her why she gave the bonds back to Tom (O'Brien) and she said that she was going on this trip and that she feared that something might happen to her and she gave them back to Tom so that when or if anything did happen that the bonds would not be found in her safety deposit box and claimed by her relatives, that under her agreement with Tom at the time she took the bonds, he was to have them if he outlived her and she wanted them in his possession in the event something fatal happened to her on this trip."

After Mr. Cushing testified to the alleged statements of appellee, she was called in rebuttal, and not only permitted to state whether or not she made the alleged statements testified to by Mr. Cushing, but she stated in detail conversations and transactions with the deceased, O'Brien, relating to the alleged gift of the bonds, in February, 1923, and also the delivery of the bonds to O'Brien in July, 1927, when she started on a motor trip. Concerning the alleged gift of the bonds in February, 1923, she was asked if she told Mr. Cushing about when Mr. O'Brien gave her the bonds, and she answered in the affirmative. She was asked by counsel to tell the jury what she told him. She answered:

"On the morning of February 21st, 1923, he called at our store and gave me the bonds. He handed them to me and said, 'Here are your bonds, Mame. I want you to have them. Take them over on your way to the opera this afternoon and put them in your box,' and that was what was said about those bonds."

She was permitted to detail other like and similar conversations and transactions with O'Brien relating to the alleged gift of the bonds in February, 1923. She was then interrogated concerning the return of the bonds to O'Brien in 1927, when she started on the motor trip. She was asked and answered as follows:

"Q. What did you do with them in 1927? A. Well, in 1927 my sister and I and my niece were going away on a long automobile trip and I hadn't so much confidence in my niece's driving and thought we might never come back, any of us, so I gave the bonds to Mr. O'Brien to keep until I come back in two weeks. He didn't want to take them because he thought something might happen to him and I would be away.

"Q. He said he wasn't going away? A. Yes, and I told him to keep them for two weeks. He said he would give them to me when I came back.

"Q. What did he say? A. And when I came back he was up in Michigan. Of course, I didn't get my bonds when he came back from Michigan, his health was very much worse than it had been when he left. He was very forgetful. He would speak often of giving the bonds back. * * *

"Q. Did you speak to him with reference to the return of these bonds after he came back from Michigan in the fall of 1927? A. Yes. Along in a month or so after he got back I spoke of his still having my bonds and of returning them, but sometimes he would make an appointment to meet me at the bank, and he would forget all about it. * * *

"Q. At any time during the time he was out there, did he discuss or say anything to you about the return of these bonds? * * * A. Every time I went out, the first time and almost every time, he told me to go to Mrs. Cushing, and she would get my bonds, that he told her they were with the rest of his holdings, and when I would go the next time he would ask me, had I been there. I always put it off thinking he would get well."

Some of the questions relating to the conversations and transactions between appellee and O'Brien were not objected to, but a number of the most important ones were objected to, which objections the court overruled and appellant excepted. However, there appears in the record one general objection to the whole of appellee's testimony. Near the conclusion of her evidence she was asked if she made certain statements to Mr. Cushing testified to by him, and she answered in the

negative. But this was after she had detailed the conversation and transactions with O'Brien. The trial again resulted in a verdict and judgment in favor of appellee, plaintiff below. Hence this appeal.

It is insisted for appellee that under section 606 of the Civil Code of Practice, after Mr. Cushing testified for appellant concerning the conversation had with appellee relating to the alleged gift of the bonds, appellee then became a competent witness to testify concerning the alleged gift of the bonds even to the extent of relating the conversation and transactions had between her and the deceased, O'Brien. It must not be overlooked that Mr. Cushing did not purport to testify to any transactions or conversations between appellee and O'Brien, but merely testified to statements that appellee made to him against her interest. Had the witness testified to transactions and conversations between appellee and O'Brien a different question might have been presented. But his testimony related only to the alleged statements of appellee against her interest, and this made her a competent witness to the extent only that she may say whether or not she made the alleged statements. It was competent for counsel to ask her whether or not she made the statements (naming them) and she could have answered such questions briefly by saying "yes" or "no," or other similar affirmative or negative language.

In Brann v. Brann, 44 S. W. 424, 426, 19 Ky. Law Rep. 1814, certain witnesses testified to statements that Brann made to them, concerning a transaction with a deceased person. The court said:

"Appellee was not a competent witness in this case to testify as to transactions had with his deceased brother, but he was competent to contradict the statements made by Perrin, Duelick, and Fryer, who testify as to statements made by him to them as to the consideration of the two notes, if he had desired to do so."

Again, the same question was presented in Justice v. Phillips, 64 S. W. 963, 23 Ky. Law Rep. 1441. Phillips testified concerning an agreement he had with Mrs. Phillips (deceased) relating to the purchase price of certain land. The court said:

"Mrs. Phillips being dead, he was not a competent

witness to detail the transaction which he had with her, because the appellant was not present at that time, and he is to be affected by the testimony. He was competent, however, to contradict any statement made by witnesses touching any admission which it is claimed he made prejudicial to his intrest."

See, also, Sovereign Camp. Woodmen of the World v. Landrum, 158 Ky. 841, 166 S. W. 598.

We conclude, therefore, that the evidence of appellee relating to conversations and transactions with O'Brien was incompetent, and the court erred in admitting it.

It is next insisted that instruction No. 1, given by the court, is erroneous. That instruction reads:

"If the jury believe from the evidence in this case that on or about the 21st day of February, 1923, Thomas J. O'Brien delivered to the plaintiff, Mary C. Murray, four $1,000.00 municipal bonds of the City of Cincinnati, Ohio, with the intention then and there to invest the title and the ownership of the said bonds in the said Mary C. Murray, and that the said Mary C. Murray, in July, 1927, delivered said bonds to the said Thomas J. O'Brien on the condition that he return the same to her and that he, the said Thomas J. O'Brien, thereafter failed or refused to re-deliver said bonds to the plaintiff, Mary C. Murray, or that the said Mary E. Cushing, as the committee of the said Thomas J. O'Brien, or as the administratrix of his estate, refused to deliver said bonds to the plaintiff upon demand made therefor, if any, the law is for the plaintiff against the defendant and the jury will so find. And unless you so believe you will find for the defendant."

The instruction might have been more aptly formed, but we think it fairly presented the issue to the jury. It is shown by the uncontradicted evidence that O'Brien delivered the bonds to appellee in February, 1923, and that she returned them to him in July, 1927. The question for the jury to determine was the purpose and effect of these respective deliveries of the bonds with respect to title thereto.

By the instruction given, before the jury could find for appellee it was required to believe from the evidence that by O'Brien's delivery of the bonds to appellee in February, 1923, he intended to and did make her a gift of the bonds so as to invest her with title thereto; and the delivery of the bonds by appellee to O'Brien, in July, 1927, was on the condition that he return the same to her, but not with intention of parting with her title thereto, if she had theretofore been invested with title.

It is insisted that certain instructions offered by appellant and rejected by the court should have been given, but since we have concluded that the instruction given was sufficient, it follows that it was not necessary to give the rejected instructions.

As the judgment will have to be reversed because of the error in the admission of the incompetent evidence indicated above, it will not be necessary to determine other questions raised.

Judgment reversed and remanded, with directions to set it aside and grant appellant a new trial, and for proceedings consistent with this opinion.